# United States Court of Appeals
## For the First Circuit

Nos. 19-1306, 19-1347

58 SWANSEA MALL DRIVE, LLC,

Plaintiff, Appellee/Cross-Appellant,

v.

GATOR SWANSEA PROPERTY, LLC,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Kayatta and Boudin,
Circuit Judges.[*]

Robert J. Shapiro, with whom Sanford F. Remz and John M. Owen were on brief, for appellant/cross-appellee.
Barry S. Pollack, with whom Joshua L. Solomon, Lauren Riddle, and Pollack Solomon Duffy LLP were on brief, for appellee/cross-appellant.

---

[*] Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

November 30, 2020

**BOUDIN, <u>Circuit Judge</u>.** This case concerns a contract dispute between landlord Gator Swansea Property, LLC ("Gator") and tenant 58 Swansea Mall Drive, LLC ("Swansea") that arose under their lease (the "Ground Lease") to a shopping center premises in Swansea, Massachusetts. Swansea subleased a portion of the premises to various retailers.

The Ground Lease was originally executed in 1984 by the parties' predecessors-in-interest. In 2013, the present parties acquired their respective interests in the premises by way of assignment of the Ground Lease. Soon after, a dispute arose over Swansea's maintenance obligations under Article 10 of the Ground Lease, which requires that Swansea maintain the premises in "good order and condition."

From May 2014 to February 2015, Gator issued a series of demand letters to Swansea concerning the condition of the parking lot, the sidewalks, and the roof and facade of the shopping center. Although many of the letters indicated that Gator would make repairs at Swansea's expense if the issues described were not addressed, none of the letters indicated that Swansea was in "breach" or "default" of its maintenance obligations.

In March 2015, Swansea sought a mortgage loan from United Bank and offered its leasehold interest in the premises as collateral. Article 6, Section 3 of the Ground Lease permitted Swansea to mortgage its leasehold interest if it was not "in

- 3 -

default . . . beyond the applicable grace periods."  Article 14, Section 4 required Gator, within ten days of receiving a request, to deliver an "estoppel certificate" verifying that Swansea was not in default and that the lease remained "in full force and effect."  Gator eventually did so.

In response, United Bank requested that Gator execute a "Section 3(n) Agreement," pursuant to Article 6, Section 3(n), of the Ground Lease.  Later, United Bank sent Gator a signed copy of the Leasehold Mortgage and a draft Section 3(n) Agreement for Gator to sign.

On October 2, 2015, Swansea filed a lawsuit in Massachusetts state court seeking an injunction requiring Gator to execute the Section 3(n) Agreement and asserting various damages claims.  Gator removed the case to the District of Massachusetts, and the district court denied Swansea's request for injunctive relief.

On October 28, 2015, United Bank notified Swansea that the proposed mortgage loan had been terminated because Swansea had not met the deadline for delivery of the Section 3(n) Agreement. In response, Swansea charged Gator with breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A.

Gator countersued, charging that Swansea had violated the Ground Lease through its subtenant's use of a pylon sign on

the premises ("the Mall Pylon"). The district court granted summary judgment to Swansea on the Mall Pylon claim.

After a nine-day bench trial, the court found that Gator had not breached its duty under Section 3(n) by refusing to sign a Section 3(n) Agreement: it had no obligation to execute an agreement, said the judge, where, as here, it had a reasonable belief that the terms of the Leasehold Mortgage could lead to future litigation over its rights to insurance proceeds. Gator's request for attorney's fees under the Ground Lease was denied.

Gator appealed, and Swansea cross-appealed. The parties agree that the appeals are timely, and we agree with the result although not with the parties' explanations for it; as the circumstances are complex and involve nothing likely to recur, there is no reason to pursue the competing rationales here.

We first address Gator's Section 3(n) obligations. Article 6, Section 3(n), of the Ground Lease provides that if Swansea seeks to mortgage its interest:

> Landlord shall, upon request, execute, acknowledge, and deliver to each Leasehold Mortgagee making such a request an agreement prepared at the sole cost and expense of the Tenant, in form reasonably satisfactory to such Leasehold Mortgagee, between Landlord, Tenant and such Leasehold Mortgagee, agreeing to all of the provisions in this Section.

Swansea argues that this section imposed on Gator a mandatory duty to execute a Section 3(n) Agreement regardless of any substantive objections to the mortgage terms. The district court ruled that

Gator had no obligation to sign the proffered Section 3(n) Agreement because it reasonably believed that the terms of the mortgage could lead to future litigation over the distribution of insurance proceeds.

The "reasonable belief" touchstone appeared for the first time in the district court's Findings of Fact, Rulings of Law, and Order After Jury-Waived Trial, with the court writing:

> 3. While the court previously observed in its Order on Plaintiff's Motion for Summary Judgment, that "Gator's duty was to execute an agreement acknowledging the provisions of Section 3 after being presented with the mortgage and recording information," see Dkt. #195 at 11, Gator was not under an obligation to do so if it reasonably believed that the terms of the mortgage could lead to future litigation over the distribution of insurance proceeds.
>
> 4. The court ultimately concludes that even though the mortgage contained qualifying language, that "[u]nless otherwise required by the Ground Lease," Gator reasonably believed that the terms of the mortgage conflicted with its insurance rights under the Ground Lease. Consequently, it had a good faith basis for hesitating to go forward, particularly when it learned that . . . Swansea had yet to cause it to be added as an additional named insured as required by Article 4 of the Ground Lease.

But in the present context, Gator's reasonable belief has no proper role. Rather, Section 3(n) required United Bank to be reasonable in insisting on what form of letter would be satisfactory to it. The only requirement that Section 3(n) places on Gator is to sign an agreement "agreeing to all of the provisions

- 6 -

in this Section [3]." Subsection (i) of Section 3 permitted Swansea to name its mortgagee as an insured party for its lease interest subject to the insurance proceeds being applied "in the manner specified in [the] Lease."

Article 5, Section 1 of the Lease specified that in the event of a casualty, Gator would either receive the casualty insurance proceeds directly (if the tenant elected to terminate the lease) or the insurance proceeds would go toward rebuilding the premises. Article 14 additionally permitted Gator to pledge its right to receive the insurance proceeds as collateral but did not expressly permit Swansea to do the same. Thus, Gator was only obligated to sign a Section 3(n) Agreement that preserved its priority rights to insurance proceeds.

None of the agreements proposed by United Bank would have unambiguously preserved Gator's status. The Leasehold Mortgage with United Bank provided that "[u]nless otherwise required by the Ground Lease and except as hereinafter provided, the proceeds of any insurance resulting from any loss with respect to the Property shall be paid to [United] Bank." As Gator points out, the "and except as hereafter provided" clause in the mortgage document could be interpreted to mean that "United Bank . . . recognized that a conflict might exist with the Ground Lease and intended any conflict would be resolved in United Bank's favor 'as hereinafter provided' in the document." So, to adequately preserve

its status Gator could only sign a Section 3(n) Agreement clearly establishing that the terms of the Lease would govern in case of any conflict with the terms of the mortgage.

Yet, United Bank repeatedly deleted language from Gator's proposed Section 3(n) Agreements designed to do just that. For example, in its October 21st draft, United Bank deleted the following language from Gator's previous proposal: "If any conflict or ambiguity is created between the Loan Documents and the Ground Lease, the terms of the Ground Lease shall prevail." That deletion, and its indication that United Bank's draft did not adequately protect Gator's rights, is bolstered by trial testimony from United Bank's attorney that United Bank would not have funded the loan without ensuring it had first priority to any insurance proceeds. And while Swansea argues that the bank simultaneously added language to the same effect, Swansea offers no explanation for the change other than to preserve the aim of United Bank's attorney. Accordingly, the district court did not clearly err in finding that Gator was not required to sign any of the Section 3(n) Agreements proposed by United Bank and did not breach the lease.

As for Gator's request for attorney's fees, Article 13 of the Ground Lease says that "[i]f Landlord or Tenant shall incur any expense, including reasonable attorney's fees, in instituting, prosecuting or defending any action or proceedings instituted by

reason of default by the other, the defaulting party shall reimburse the other for the amount of such expense."

After trial, the district court declined to award Gator its attorneys' fees, reasoning that Swansea was not in material default of its maintenance obligations since Gator failed to: (1) prove that any potential default was "beyond the applicable grace period," or (2) properly give notice of any default under Article 12, Section 1(b)(ii) of the Ground Lease.

The district court also concluded that Swansea was not in default of its insurance obligations because it was unaware of any lapse in insurance coverage whereby Gator had not been listed as a named insured on the casualty insurance policy for the leased premises. The district court's decision not to grant fees is reviewed for abuse of discretion, although its interpretation of Article 13 is reviewed de novo. Deutsche Bank Nat'l Tr. Co., Tr. for FFMLT Tr. 2005-FF2 v. Pike, 916 F.3d 60, 73 (1st Cir. 2019).

Gator argues that Article 13 is best read as a general fee-shifting provision, entitling the prevailing party in any dispute under the Ground Lease to costs and fees. But the drafters failed to include traditional "prevailing party" language. Cf., e.g., 42 U.S.C. § 1988(b). Instead, under the terms of Article 13, a party to the Ground Lease is entitled to fees in an action instituted "by reason of default by the other" -- not where a party successfully defends against an allegation of its own default.

Gator argues that the Ground Lease is a "bond lease," meaning that "the tenant is responsible for <u>all</u> operating costs including insurance and repairs and replacements, so long as the landlord is not in breach." Gator cites various cases not on point: here, the Ground Lease contains a limited definition of default <u>and</u> lacks general prevailing party language.

Finally, Gator argues that the definition of "default" in Article 12 of the Ground Lease, which includes a provision for notice and the opportunity to cure before the tenant is considered "in default," does not define "default" for the purposes of Article 13's fee-shifting provisions. This argument, even if successful, would give us a "default by" Swansea but not a lawsuit "instituted by reason of default by the other."

Last, we address the parties' dispute over the Mall Pylon. The original landlord to the premises constructed the Mall Pylon in 1989 after receiving a permit from the Town of Swansea. When Gator's predecessor-in-interest, Carlyle Swansea Partners, LLC, was landlord from 2001 to 2013, the Mall Pylon was used to advertise an adjacent mall and its tenants; none of the tenants or subtenants of the shopping center were featured on the sign.

Carlyle recorded an easement granting Wal-Mart, a tenant of the adjacent mall, the right to place signage on the Mall Pylon. The assignment of the Ground Lease to Swansea identified the leasehold as subject to two exceptions: (1) the 1989 sign permit

- 10 -

and (2) the 2012 easement granted to Wal-Mart. No tenant or subtenant of the shopping center used the Mall Pylon until August 2016, when PriceRite, one of Swansea's subtenants, installed a sign.

After Gator sent Swansea a notice of default, claiming that use of the pylon breached the lease, Swansea filed for declaratory and injunctive relief. Gator filed a counterclaim, asserting that Swansea had breached the lease by encroaching on the Mall Pylon.

The district court ruled on summary judgment that Swansea's subtenant's use of the Mall Pylon did not breach the Ground Lease. On appeal, Gator claims that the district court erred in concluding that the Ground Lease must contain an express reference to the Mall Pylon or a blanket prohibition on that pylon's use. We disagree for the reasons stated by the district court.

While other claims are made on this set of appeals, any purported errors would be harmless and need no further discussion.

Affirmed.